Lemuel Anthony McNEIL, Appellant

v.

STATE of Texas, Appellee.

No. 01–11–00371–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 10, 2011.

Rehearing En Banc Overruled March 22, 2012.

Discretionary Review Refused Sept. 12, 2012.

---

Nathan N. Beedle, Nathan N. Beedle P.C., Spring, for Appellant.

Eric Kugler, Assistant District Attorney of Harris County, Houston, for the State.

Panel consists of Chief Justice RADACK and Justices BLAND and HUDDLE.

## OPINION

JANE BLAND, Justice.

In December 2001, Harris County firefighters and emergency medical personnel responded to an emergency call from Lemuel Anthony McNeil reporting a fire in his home. Inside, they found McNeil still conscious but overcome by smoke. They also found the body of his thirteen-month-old daughter.

A grand jury indicted McNeil on charges of capital murder and arson. The State first tried McNeil on the capital murder charge, which resulted in an acquittal. This appeal arises from the trial on the arson charge. The jury found McNeil guilty of arson and of using a deadly weapon, namely fire, during its commission, and assessed a punishment of 23 years' confinement. The trial court entered judgment on the verdict.

McNeil appeals, contending that: (1) the trial court erred in allowing the State to try the deadly weapon charge; (2) the evidence does not support the judgment; (3) the trial court erred in admitting evidence relating to the child and the fact of her death; (4) the trial court erred in excluding evidence that McNeil was acquitted of capital murder; and (5) the trial court erred in denying McNeil's special plea in bar based on collateral estoppel. We find no error and affirm.

### Background

McNeil and Stephanie Flournoy met each other at church. They both participated in the church's prayer ministry team, and McNeil hired Flournoy to clean his house. They had a brief sexual relationship, and Flournoy became pregnant.

McNeil became extremely angry when he learned of the pregnancy. He insulted Flournoy and asked her to abort the pregnancy, but she refused. When the other churchmembers learned of Flournoy's pregnancy, McNeil, who had been dating another member in the church, lost face

and was removed from the prayer ministry team.

Before Flournoy gave birth, McNeil petitioned in family court for sole custody of the child and to terminate Flournoy's parental rights. At the hearing, which was held a year after the child was born, the family court denied McNeil's requests. The court ordered him to pay child support and granted him visitation with the child for three hours every Saturday afternoon. McNeil reacted angrily to the ruling and slammed the doors on the way out of the courtroom.

McNeil's first visit was scheduled for Saturday, December 15, 2001. The Friday before, McNeil complained to a co-worker that the custody and visitation arrangements were not the way they were "supposed to be." McNeil also told the co-worker that he was going to "fix this situation," and that the next time he saw the co-worker, "all this stuff would be over with."

On Saturday, McNeil's friend, Yvonne Reid, met McNeil at his house to help him with the visit. McNeil told her that he was not feeling well that morning. That afternoon, they picked up the baby from Flournoy and brought her to McNeil's home. Reid's daughter, whom Reid had enlisted to help care for the baby, met them there. The baby was fussy, so the women soothed her. They made a pallet on the floor in front of the fireplace and put the baby to sleep there. McNeil said he felt chilled and asked Reid to light a fire in the fireplace. Reid turned on the gas and lit the fire with a match. When she and her daughter left the house at approximately 3:40 p.m., the baby was still asleep on the floor and McNeil was resting on the couch.

At 5:39 p.m., McNeil called for emergency assistance, but the smoke from the fire made it impossible for him to speak. The City of Houston Fire Department (HFD) responded to the call. The emergency medical technicians (EMTs) arrived first. They saw smoke coming out of the front door, and opened it to discover McNeil face-down in the front hall with the phone near his hand. They found the baby in the living room, still on the pallet by the fireplace. The baby was unresponsive and had no vital signs, and the EMTs were unable to resuscitate her.

Acting Captain J. Trevino arrived at the house and quickly doused the fire. He smelled gasoline near the couch in the living room and reported the finding. HFD arson investigator T.E. Wood conducted a four-hour inspection of the home later that evening. He noticed the fire's burn pattern indicated that the fire started near a living room baseboard. Wood found it peculiar that a Christmas tree, which stood near the fireplace, was burned on one side but not the other. In examining the fireplace, Wood found the flue in the closed position, which meant that excess heat and smoke from a fireplace fire would stay in the house instead of being drawn up the chimney.

After executing a search warrant, Wood visited the home a second time on January 29. Wood opined that "someone placed gasoline across the floor of the north end of the den to the east wall to the west wall or from the west wall to the east wall and ignited the fumes of that gasoline with some type of open flame, possibly a match." Wood acknowledged that the fireplace fire was a possible ignition source, but stated that he did not believe that the fire in the fireplace or the Christmas tree caused the fire.

Martin, the inspector for McNeil's landlord's insurer, first visited the home on December 29, 2001, accompanied by a dog that had been trained to detect flammable

residue. Based on the dog's failure to alert, Martin tentatively determined that the fire was accidental. In late February 2002, Martin returned to take debris samples from the burned area. That time, he brought 2 trained dogs, which signaled the presence of flammable residues. After discussing the case with the HFD arson unit, Martin amended his report ·to conclude that the fire was incendiary, not accidental, in origin.

On January 8, 2002, McNeil's rental insurance carrier sent its inspector, Gary Morgan, to determine the fire's origin and cause. Morgan collected floor debris from the affected area and submitted it· for chemical analysis. The analysis tested negative for any identifiable flammable liquids. The HFD arson unit refused to provide Morgan with its information about the cause of the fire. Morgan classified the cause of the fire as undetermined,. and he testified that his findings were not consistent with an accelerated fire.

The defense presented two rebuttal experts. The first, Michael Waltersheidt, was a retired Texas A & M University professor who holds a Ph.D. in plant pathology and owns a Christmas tree farm. Waltersheidt did not personally inspect the partially burnt tree found in McNeil's home, but, based on general knowledge, he opined that tree was cut in either the Midwest or Pacific Northwest in early November 2001, then transported to Texas for sale. He presumed that the top of the tree had dried out.

Johnny Thornton, an independent fire investigator, testified as the second defense expert. Thornton theorized that the closed fireplace flue caused heat and smoke from the fireplace fire to accumulate in the house, and that the tree and the window valance caught fire once the heat reached the ignition point for those two objects, and the burning needles or valance hit the floor causing the burning along the baseboard. ·Based on these observations, Thornton concluded that the fire was accidental.

## Discussion

### I. Collateral estoppel

■■■ Three of McNeil's appellate complaints—arising out of the trial court's refusal to quash the deadly weapon charge, certain evidentiary rulings, and its denial of his special plea—depend on whether the trial court erroneously refused to give collateral estoppel effect in· this arson proceeding to his·prior acquittal on the capital murder charge. We first considered the collateral estoppel effect of the acquittal in our decision denying McNeil's pretrial request for habeas corpus relief. *See Ex parte McNeil*, 223 S.W.3d 26 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd). There, we observed that collateral estoppel is a corollary of the Fifth Amendment prohibition against double jeopardy made applicable to the states through the Fourteenth Amendment. *Id.* at 31–32 (citing *Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970)). Collateral estoppel "means ... that when an issue of. ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443, 90 S.Ct. at 1194. To determine whether collateral estoppel bars a subsequent prosecution, a reviewing court must ascertain "(1) exactly what facts were 'necessarily decided' in the first proceeding; and (2) whether those 'necessarily decided' facts constitute essential elements of the offense in the second trial." *Ex parte Taylor*, 101 S.W.3d 434, 441 (Tex.Crim.App.2002).

■■ To determine whether a fact was necessarily decided in a prior proceeding,

reviewing courts must determine whether specific facts were decided by the jury and if so, how·broad the scope of the jury's findings were in terms of time, space, and content. *Ex parte Watkins*, 73 S.W.3d 264, 268 (Tex.Crim.App.2002). "The mere possibility that a fact *may* have been determined in a former trial is insufficient to bar relitigation of that same fact in a second trial." *Id.* (emphasis in original). A reviewing court must examine the entire trial record, including the pleadings, the evidence, the charge, and the arguments of counsel "to determine 'with realism and rationality' precisely which facts the jury *necessarily* decided and whether the scope of its findings regarding specific historical facts bars relitigation of those same facts in· a second criminal trial." *Id.·* at 268–69 (emphasis in original).

### A. Deadly weapon charge

■ McNeil contends that the trial court erred in denying his motion to quash the deadly weapon paragraph in the arson indictment because, in the capital murder trial, he was necessarily acquitted of the charge that he had used a deadly weapon. The State initially counters that McNeil waived this challenge by failing to secure a ruling on his motion to quash the indictment on this ground. McNeil, however, raised the issue before trial in an amended application for writ of habeas corpus, which the trial court denied. He also complained about submission of this charge to the jury before the·parties presented their closing arguments. McNeil timely raised the issue and secured a ruling, and thus preserved it for review.

■ In contending that collateral estoppel precluded the State from relitigating the deadly weapon issue, McNeil points to our conclusion in his first habeas corpus proceeding that, in order to acquit him of capital murder, the jury "necessarily determined that the complainant [the child]

did not die from appellant smothering her with a deadly weapon, namely his hands or an unknown item, and that [the child] therefore died by other means." *McNeil,* 223 S.W.3d at 31–32. We determined that, "by finding appellant not guilty of the offense of capital murder, the jury only necessarily found that appellant did not smother [the child]." *Id.* at 31. We acknowledged that the issue of "whether appellant intentionally started the fire was a disputed issue in the capital murder trial," but determined that the jury was not required to resolve that fact and could have grounded its verdict only on the issue of whether McNeil smothered the child regardless of whether he started the fire. *Id.* As a result, we concluded, the jury's "verdict did not address whether appellant started the fire." *Id.* at 32.

In the trial of this arson case, the charge asked the jury to find whether McNeil "used or exhibited a deadly weapon, namely, a fire, during the commission of the [arson of the habitation] or during the immediate flight therefrom." The definition of "deadly weapon" provided to the jury tracks the Penal Code definition of "deadly weapon": "anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(A), (B) (West 2006). The Court of Criminal .Appeals has explained that "[t]he placement of the word 'capable' in [section 1.07(a)(17)(B) ] enables the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force." *McCain v. State,* 22 S.W.3d 497, 503 (Tex. Crim.App.2000).

In arguing at closing that the fire McNeil started was capable of causing death or serious bodily injury, the State

highlighted the evidence that McNeil himself was injured in the fire and that the fire put rescue workers in harm's way. Neither of these facts was 'necessarily decided' in the capital murder proceeding, so the State was not collaterally estopped from prosecuting the deadly weapon charge on that ground.

■ McNeil also complains that the deadly weapon paragraph of the indictment is defective because it is redundant of the underlying crime of arson. We recently upheld a conviction and deadly weapon finding in which the appellant's conduct in starting the fire, which supported his conviction for arson, also served to support the deadly weapon finding. *See Mims v. State*, 335 S.W.3d 247 (Tex.App.-Houston [1st Dist.] 2010, pet. filed). In *Mims*, we specifically rejected the same contention that McNeil makes here, reasoning that the legislature did not "exempt first-degree felony offenses involving bodily injury or death from the statutory scheme governing deadly weapon findings." *See id.* at 251.

### B. Evidence concerning the child and her death

■ McNeil also contends that the trial court erred in admitting evidence of the child and the fact of her death because his prior acquittal of the capital murder charge collaterally estopped the State from presenting that evidence.[1] McNeil relies on our determination in the habeas proceeding that:

In order to acquit appellant, the jury thus necessarily determined that complainant did not die from appellant smothering her with a deadly weapon, namely his hands or an unknown item, and that complainant therefore died by other means. That fact cannot be relitigated and is barred by collateral estoppel.

*McNeil,* 223 S.W.3d at 31. McNeil claims that this determination required the trial court to exclude all evidence of the child's death. Collateral estoppel, however, is not as broad as he suggests. *See id.* at 31 n. 4. Evidence of an otherwise admissible extraneous offense is not rendered inadmissible merely because the defendant has been acquitted of that offense in a previous criminal trial. *Dowling v. United States,* 493 U.S. 342, 348–49, 110 S.Ct. 668, 672–73, 107 L.Ed.2d 708 (1990). Whether collateral estoppel bars evidence of that offense depends on whether the prosecutor will rely on evidence of other, unprosecuted conduct to prove an essential element of the later-tried offense. *See State v. Houth,* 845 S.W.2d 853, 864 (Tex.Crim. App.1992). When the prosecutor relies solely on evidence of other conduct to prove an essential element of the subsequent offense, the prosecution is not jeopardy-barred. *Id.*

■ In the capital murder trial, McNeil did not contest the fact that the rescue workers found the child dead in his home. In acquitting McNeil of capital murder, the jury necessarily found that the child "died by other means," and not

---

1. McNeil complains of error in denying his motion in limine with respect to evidence concerning the child, but a motion in limine does not preserve error. *See Norman v. State,* 523 S.W.2d 669, 671 (Tex.Crim.App.1975). During trial, however, McNeil secured a running objection to any mention of "the child" and a running motion for new trial, and obtained rulings denying the objection and the motion. McNeil also reiterated his objection when the issue arose at other times throughout the trial. McNeil therefore preserved his objections to the evidence concerning the child, and we construe his complaint as one of error in its admission. *See Tibbs v. State,* 125 S.W.3d 84, 88 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd) (concluding that appellant's acts of filing motion in limine, objecting to evidence when tendered, and obtaining running objections preserve error).

by McNeil smothering her. *McNeil,* 223 S.W.3d at 31. That determination, however, is not the same as an affirmative finding on the cause of the child's death. *Id.* The capital murder acquittal thus does not collaterally estop the State from introducing evidence that the child was found dead in the house. Because the jury might reasonably conclude that McNeil intentionally started a fire capable of causing death or serious bodily injury even if it did not believe beyond a reasonable doubt that McNeil murdered the child by smothering her, collateral estoppel does not bar admission of this evidence. *See Dowling,* 493 U.S. at 348–49, 110 S.Ct. at 672–73; *see also United States v. Brackett,* 113 F.3d 1396, 1400 (5th Cir.1997) (holding that general verdict of acquittal, exculpating defendant of liability for substantive offense, does not estop the government from introducing same evidence in subsequent prosecution mean as proof of non-criminal overt acts in furtherance of conspiracy to commit same offense).

### 1. Relevance

During McNeil's arson trial, the trial court admitted portions of the child's autopsy report, as well as other evidence that the child died from an unknown cause and had died before the fire started. McNeil challenges the trial court's admission of evidence regarding the child's death because it was not relevant, and even if relevant, that evidence was outweighed by its prejudicial nature.

We review challenges to the admission of evidence under an abuse of discretion standard. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1990). If the trial court's ruling is in a "zone of reasonable disagreement," then it has not abused its discretion. *Moreno v. State,* 858 S.W.2d 453, 463 (Tex.Crim.App. 1993). For evidence to be relevant it does not have to, by itself, prove or disprove a particular fact. *Ex parte Smith,* 309 S.W.3d 53, (Tex.Crim.App.2010) (quoting *Stewart v. State,* 129 S.W.3d 93, 96 (Tex. Crim.App.2004)). Motive is a relevant factor in proving that a suspect willfully started a fire. *Massey v. State,* 154 Tex.Crim. 263, 226 S.W.2d 856, 859 (1950).

Evidence regarding the child's death was relevant to show McNeil had a motive for starting the fire. The State contended that McNeil panicked when he learned of the child's death. Given his contentious relationship with the child's mother and his anger over the child's existence, a reasonable jury could infer that McNeil started the fire to divert any blame for the child's death away from himself.

### 2. Danger of unfair prejudice

If the trial court determines that the proffered evidence has probative value, it must balance that value against the countervailing considerations listed in the rules of evidence. Tex.R. Evid. 403; *Jackson v. State,* 314 S.W.3d 118, 125 (Tex. App.-Houston [1st Dist.] 2010, no pet.). Even if it is relevant evidence may still be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. Tex.R. Evid. 403. A trial court's decision on admissibility will be overturned only when a clear disparity exists between the evidence's degree of prejudice and its probative value. *Conner v. State,* 67 S.W.3d 192, 202 (Tex.Crim.App.2001). There is a presumption though, that relevant evidence will be more probative than prejudicial. *Jones v. State,* 944 S.W.2d 642, 652 (Tex.Crim.App.1996). We analyze whether such a disparity exists by applying the following six factors:

(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State,* 210 S.W.3d 637, 641–42 (Tex.Crim.App.2006).

The first and second factors favor admission of the evidence that the child was dead before the fire started because it strongly supports the State's position that McNeil had a motive to commit arson. Evidence that McNeil waged an unsuccessful battle for sole custody of the child shortly before the fire supports an inference that McNeil knew that the child's death would look suspicious, and suggests that he had a motive to make the scene look like he was not responsible for her death. *See Gosch v. State,* 829 S.W.2d 775, 783 (Tex.Crim.App.1991). The jury considered physical evidence about the cause of the fire as well as experts from both sides, who had conflicting opinions as to the fire's origin. Evidence of motive could assist the jury in determining the credibility and weight of these expert opinions.

As to the remaining factors, evidence of a child's death obviously creates a risk that the jury's heightened emotions may lead it to reach an erroneous conclusion. Cognizant of the potential emotional impact, though, the trial court excluded evidence that might lead the jury to conclude that McNeil was responsible for the child's death. It required the State to redact

from the autopsy report any suggestion that McNeil was at fault and prohibited the State from intimating that the autopsy report showed that the child died under suspicious circumstances. In addition, the trial court prohibited the State from stating during closing argument that the child was healthy when she left her mother's custody and, approximately three hours later, she was dead, concluding that the statement could imply that McNeil did something to the child and it was not a reasonable argument supporting any element of the arson. Instead, the State reminded the jury that the cause of death was a mystery and that no evidence pointed to McNeil being at fault.

The record shows that most of the evidence presented at trial related to the origin and circumstances of the fire, and the relationship between McNeil and Flournoy. The trial court made various rulings to limit evidence on the issue of the child's death and admonished both sides to move past the issue when it was raised in questioning. The three witnesses who provided the bulk of the testimony concerning the child's death did not spend much time on the issue. The risk of unfair prejudice did not substantially outweigh the probative value of that evidence to show a motive for arson, as limited by the trial court. We hold that the trial court did not abuse its discretion in admitting it.

### C. Special plea

McNeil contends that the trial court erred in refusing to submit his special plea at bar to the jury. We review the trial court's decision on a plea of former jeopardy for an abuse of discretion. *See Lewis v. State,* 865 S.W.2d 478, 481 (Tex. App.-Tyler 1993, no pet.).

Section 27.05 of the Code of Criminal Procedure provides:

A defendant's only special plea is that he has already been prosecuted for the same or a different offense arising out of the same criminal episode that was or should have been consolidated into one trial ...

TEX.CODE CRIM. PROC. ANN. § 27.05 (West 2009). The special plea is required to be verified by an affidavit from the defendant stating the former cause and its outcome. *Id.* § 27.06. The trial court usually must submit the special plea to the jury unless, assuming the facts in the plea to be true, it does not state a legal former jeopardy claim, the court may overrule it and refuse to submit it to the jury. *See* TEX.CODE CRIM. PROC. ANN. art. 27.07; *Apolinar v. State*, 820 S.W.2d 792, 794 (Tex.Crim.App. 1991).

▪ McNeil contends that the trial court should have granted his plea because the two alleged offenses occurred in the same criminal episode. The Penal Code provision addressing joinder does not make consolidation of offenses for trial mandatory; it provides that a "defendant *may* be prosecuted" in one action for "all offenses arising out of the same criminal episode." TEX. PENAL CODE ANN. § 3.02 (West 2011) (emphasis added). McNeil does not identify any authority to support his contention that the trial court was required to consolidate both charges into one trial.[2]

In *Stevens v. State*, the Court of Criminal Appeals explained that section 27.05's special plea and consolidation language does not trump section 3.02's permissive language. 667 S.W.2d 534, 536–38 (Tex. Crim.App.1984). Section 3.02 provides that offenses arising out of a single criminal episode may be consolidated for trial,

but does not make consolidation mandatory. *See Nelson v. State*, 864 S.W.2d 496, 498 (Tex.Crim.App.1993) (holding defendant does not have right to consolidate offenses committed in same criminal episode); *Stevens*, 667 S.W.2d at 536. As *Stevens* explains, the legislature amended article 27.05 to add the "should have been consolidated" language anticipating that the Penal Code provisions under consideration would make joinder mandatory in some circumstances, but the enacted legislation contained no such provision. *Id.* at 537.

Since *Stevens* was decided, the legislature expanded the definition of "criminal episode" in section 3.01 beyond property crimes to include all of the offenses identified in the Penal Code. *See* TEX. PENAL CODE ANN. § 3.01 (West 2011) (defining "criminal episode" as "the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property," either pursuant to the same transaction or to a common scheme or plan, or repeated commission of same or similar offenses); *see generally* Acts 1973, 63rd Leg., p. 883, ch. 399, § 1, eff. Jan. 1, 1974, *amended by* Acts 1987, 70th Leg., ch. 387, § 1, eff. Sept. 1, 1987. Section 3.02's permissive language remains unchanged. *See* TEX. PENAL CODE ANN. § 3.02 (West 2001); *Stevens*, 667 S.W.2d at 536. We conclude that the special plea provision did not require the trial court to the arson charge and the capital murder charge into one trial.

▪ Similar to his collateral estoppel argument, McNeil also contends that the inclusion of the "with FIRE" deadly weapon charge shows that the State is attribut-

---

**2.** "Neither the Federal nor State Constitutions nor Texas statutes prohibit multiple prosecution for two statutory offenses committed in the same transaction. The constitu-

tional provisions speak of double jeopardy in terms of the 'same offense' rather than 'same transaction.'" *Ex parte McWilliams,* 634 S.W.2d 815, 823 (Tex.Crim.App.1980).

ing guilt for the child's death onto McNeil, requiring a special plea instruction. But, as we have observed, the indictment charges that the deadly weapon was "used and exhibited"; it does not allege any connection to the child's death. The elements of the offense of arson are not same as those of capital murder, and a finding of one in these circumstances is not dispositive of the other. *Compare* TEX. PENAL CODE ANN. § 19.03 *with id.* § 28.02 (West 2009). A reasonable jury could find that McNeil used and exhibited fire without finding that McNeil caused the child's death. We hold that the trial court did not abuse its discretion in refusing to submit the special plea to the jury.

## II. Evidentiary sufficiency

### A. Standard of review

 McNeil contends that the record does not contain factually sufficient evidence to support the jury's finding that he is guilty of arson. We review all evidentiary sufficiency challenges under the same standard. *See Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim.App.2010) ("[T]he *Jackson v. Virginia* legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.") (referring to *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Under this standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable .doubt. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *In re Winship,* 397 U.S. 358, 361, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970); *Laster v. State,* 275 S.W.3d 512, 517 (Tex.Crim.

App.2009); *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007).

 Viewed in the light most favorable to the verdict, the evidence is insufficient when either: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense; or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson,* 443 U.S. at 314, 319 n. 11, 320, 99 S.Ct. 2781; *Laster,* 275 S.W.3d at 518; *Williams,* 235 S.W.3d at 750. This standard applies equally to both direct and circumstantial evidence. *King v. State,* 895 S.W.2d 701, 703 (Tex.Crim.App.1995).

 We do not weigh any evidence or evaluate the credibility of any witnesses, as this was the function of the fact finder. *Williams,* 235 S.W.3d at 750. Instead, we determine whether both the explicit and implicit findings of the fact finder are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict and resolving any inconsistencies in the evidence in favor of the verdict. *Adelman v. State,* 828 S.W.2d 418, 422 (Tex. Crim.App.1992).

### A. Arson

 To support McNeil's conviction for arson, the evidence must allow a rational fact finder to find each of the essential elements of arson was proved beyond a reasonable doubt. Under the pertinent provision of the Texas Penal Code in effect when McNeil was charged, "[a] person commits an offense [of arson] if the person starts a fire, regardless of whether the fire continues after ignition, or causes an explosion with intent to destroy or damage . . . any building, habitation, or vehicle . . . knowing that it is within the limits of an incorporated city or town." TEX. PENAL CODE ANN. § 28.02(a)(2)(A) (West 2003). The indictment alleges that McNeil:

did then and there unlawfully, start a fire by igniting a flammable liquid with the intent to damage or destroy a habitation located at 10211 CHERRY LIMB, knowing that the habitation was within the incorporated limits of a city, namely, Houston, Texas.

It is further presented that at the time the Defendant committed the felony offense of ARSON on or about December 15, 2001, as hereinabove alleged, he used and exhibited a deadly weapon, namely, FIRE during the commission of and during the immediate flight therefrom.

McNeil relies on *O'Keefe v. State*, 687 S.W.2d 345 (Tex.Crim.App.1985); *Machado v. State*, 753 S.W.2d 252 (Tex.App.-Houston [1st Dist.] 1988), *pet. ref'd*, 767 S.W.2d 809 (Tex.Crim.App.1989); *Baugh v. State*, 776 S.W.2d 583 (Tex.Crim.App. 1989), and *Troncosa v. State*, 670 S.W.2d 671 (Tex.App.-San Antonio 1984, no pet.), in contending that various circumstances— such as the presence or absence of witnesses, conflicting expert testimony concerning the use of accelerant, a defendant's recent application for insurance or additional coverage—have factored into evidentiary sufficiency reviews in arson cases. Those cases found the evidence insufficient under a defunct legal standard, making them inapposite. *See Cole v. State*, No. 01–06–00742–CR, 2007 WL 4099371, at *2 (Tex.App.-Houston [1st Dist.] Nov. 15, 2007, no pet.) (mem. op., not designated for publication) (citing *Geesa v. State*, 820 S.W.2d 154, 159–61 (Tex.Crim. App.1991)). We examine the circumstances identified in earlier cases that may be present or absent in this case, but they are not exclusive, and none is a linchpin in any earlier case that automatically renders the evidence sufficient or insufficient to support an arson conviction. We review the individual circumstances presented to the jury in this case to decide whether a rational fact finder could have found that

each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781.

The evidence is undisputed that the December 15, 2001 fire damaged McNeil's residence, which was within the Houston city limits. McNeil specifically challenges the sufficiency of the evidence supporting the jury's finding that he started the fire. Multiple pieces of debris recovered from the home tested positive for the presence of an accelerant, and Trevino smelled gasoline in the living room immediately after the fire. McNeil placed the Christmas tree near the hearth and asked his friend to light a fire in the fireplace that afternoon before she left. Yet, some evidence shows that the fire began neither the tree nor the fireplace, but instead that the burn patterns resulted from a flammable liquid along the living room baseboard. McNeil had a contentious relationship with the baby's mother and had expressed serious dismay over the family court's rulings. These problems provided him a motive to conceal the circumstances surrounding the baby's death. Based on our review of the record, we hold that a rational fact finder could have found beyond a reasonable doubt that McNeil started the fire by igniting a flammable liquid with the intent to damage or destroy the home.

### III. Evidence of acquittal during punishment phase

McNeil challenges the trial court's exclusion of his capital murder acquittal during the punishment phase. Section 37.07 of the Texas Code of Criminal Procedure gives the trial court broad discretion to allow evidence during sentencing. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2010). "[R]elevance during the punishment phase of a noncapital trial is determined by what is help-

ful to the jury." *Erazo v. State*, 144 S.W.3d 487, 491 (Tex.Crim.App.2004); *see Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim.App.1999); *Contreras v. State*, 59 S.W.3d 362, 365 (Tex.App.-Houston [1st Dist.] 2001, no pet.). We will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *See Green*, 934 S.W.2d at 101–02.

■■■■■ The trial court reasonably could have determined that evidence of the capital murder acquittal would confuse the jury. Neither the State nor the defense may relitigate a finding of guilt or acquittal at the punishment phase. *See McGee v. State*, 197 S.W.3d 802, 805 (Tex.App.-Houston 2006), *aff'd*, 233 S.W.3d 315 (Tex. Crim.App.2007). The trial court also reasonably could have concluded that the acquittal was not relevant to the sentencing policies of deterrence, rehabilitation or the prevention of recidivism. *See* TEX. PENAL CODE. ANN. § 1.02(1) (West 2011); *Rogers*, 991 S.W.2d at 265–66. As a result, we hold that the trial court did not abuse its discretion in excluding evidence that McNeil was acquitted of the capital murder charge.

### Conclusion

We hold that: (1) the trial court did not err in allowing the State to try McNeil on the deadly weapon charge; (2) the trial court did not abuse its discretion in admitting limited evidence relating to the child and her death as a motive for arson; or in excluding evidence that McNeil was acquitted of capital murder; (3) the evidence is sufficient to support the judgment; and (4) the trial court did not err in denying McNeil's special plea in bar. We therefore affirm the judgment of the trial court.