

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00071-CR

_____

MARCUS CALDWELL, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 485th District Court
Tarrant County, Texas
Trial Court No. 1601657D

---

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Marcus Caldwell appeals his conviction for felony driving while intoxicated (DWI) with a habitual-offender enhancement and a deadly-weapon finding. *See* Tex. Penal Code Ann. §§ 1.07(a)(17), 12.42(d), 49.04(a), 49.09(b)(2). On appeal, Caldwell argues in two issues that (1) the trial court erred by failing to define "alcohol concentration" in its jury charge, *see id.* § 49.01(1), and (2) the trial court abused its discretion by admitting over Caldwell's Rule 403 objection a surveillance video showing Caldwell's car hitting a pedestrian, *see* Tex. R. Evid. 403. We will affirm.

## II. BACKGROUND

### A. Incident and Arrest

On April 16, 2019, shortly before midnight, Caldwell was driving through a traffic-light-controlled intersection at a high rate of speed when he hit a pedestrian who had walked more than halfway through the crosswalk.[1] After parking his vehicle in a nearby lot, Caldwell checked on the seriously injured pedestrian and called 911. An eyewitness to the collision, David Arthur, also called 911.

Fort Worth Police Officer Brian Hancock was dispatched to the scene. When he arrived at approximately 11:52 p.m., Officer Hancock saw a man lying in the

---

[1]Video surveillance footage shows that the traffic light was still green when Caldwell drove through the intersection and that the pedestrian was jaywalking.

middle of the roadway with a pickup truck blocking him so that he would not be hit by other vehicles. Officer Hancock spoke with Caldwell and Arthur. Caldwell told him that he had been driving northbound coming from his home when he struck a man who had stepped in front of his vehicle.

While speaking with Caldwell, Officer Hancock detected a strong odor of alcohol. Caldwell stated that earlier in the day he had consumed two twenty-four-ounce beers and had smoked one joint of marijuana.[2] Because of the alcohol smell and his observations that Caldwell had bloodshot and watery eyes and an unsteady balance and sway, Officer Hancock decided to investigate Caldwell for DWI.

Officer Hancock attempted to administer the three-part standard field sobriety test (SFST): the horizontal-gaze nystagmus test (HGN), the walk-and-turn test, and the one-leg stand test. During the HGN test, Caldwell displayed all six possible intoxication clues.[3] In addition, Officer Hancock noticed that when Caldwell was being positioned to do the HGN test, his body did a "circle sway," which—although not officially part of the SFST—is a sign of intoxication. Officer Hancock was unable

---

[2]According to Caldwell, he had consumed the second beer approximately two to three hours before speaking with Officer Hancock. He did not state exactly when he had smoked the marijuana joint.

[3]Officer Hancock testified that it is standard protocol to arrest a driver suspected of DWI if he displays at least four out of six possible intoxication clues during the HGN test.

3

to administer the walk-and-turn and one-leg stand tests because Caldwell, claiming that he could not perform the tests because he is "slew-footed," refused to participate.

Ultimately, based on "[e]verything [he] observed from the time [he] walked up on the scene," including the smell of alcohol; Caldwell's bloodshot, watery eyes; his staggering and swaying; his wet pants (which indicated that he had possibly urinated on himself); and his apparent confusion regarding his trip's starting point, Officer Hancock concluded that Caldwell was intoxicated and decided to arrest him. While being transported to jail, Caldwell fell asleep in the back of the patrol vehicle, another sign of intoxication.

After arriving at the jail, Caldwell initially consented to a blood test but then revoked his consent after being taken to the hospital. Officer Hancock obtained a warrant, and Caldwell's blood was ultimately drawn at 2:48 a.m., approximately three hours after the incident had occurred.

## B.  Indictment and Trial

Caldwell was indicted for DWI with two previous DWI convictions, a third-degree felony.[4]  *See* Tex. Penal Code Ann. §§ 49.04(a), 49.09(b)(2).  The indictment included a habitual-offender notice alleging that Caldwell had been convicted of two

---

[4]At trial, Caldwell called Timothy Lovett, a collision reconstructionist whose company is retained by the Tarrant County District Attorney's office, as a defense witness.  Lovett testified that he recommended that Caldwell's case be charged as a DWI, rather than an intoxication-assault case, because there was no evidence showing that Caldwell had been speeding or violating any other traffic laws at the time of the collision.

prior and sequential felonies, raising the punishment range for his offense to twenty-five to ninety-nine years or life in prison. *See id.* § 12.42(d). The indictment also alleged that Caldwell had used a deadly weapon—his motor vehicle—during the commission of the offense. *See id.* § 1.07(a)(17). Caldwell pleaded "not guilty" to the offense and "not true" to the habitual-offender and deadly-weapon allegations,[5] and a jury trial was held.

At trial, Arthur gave an eyewitness account of Caldwell's vehicle hitting the pedestrian and what happened immediately afterward, and both Caldwell's and Arthur's 911 calls were played for the jury. The State also introduced photographs showing the collision's aftermath. Officer Hancock testified regarding his above-described observations upon arriving on the scene, including the factors that led him to arrest Caldwell for DWI.

The State also sought the admission of a surveillance video showing Caldwell's vehicle hitting the pedestrian. During a pretrial conference, Caldwell objected on Rule 403 grounds, and the video's admission became a hotly contested issue. After hearing extensive arguments from both sides and watching the video, the trial court overruled Caldwell's Rule 403 objection. However, the trial court, acknowledging that it was a "very close call," told Caldwell's counsel that if he found "any cases or any

---

[5]Although Caldwell initially pleaded "not true" to the habitual-offender allegation, he later pleaded "true" to this allegation during the trial's punishment phase.

5

new arguments" that he wanted the trial court to consider before the video was offered into evidence, the trial court would consider them and reevaluate its position.

Before the start of trial the next day, the defense presented to the trial court additional arguments and case law supporting its Rule 403 objection, and the State explained at length why the video should be admitted. Concluding that it was too close a call to make before trial, the trial court converted Caldwell's Rule 403 objection into a motion in limine and delayed ruling on the objection until it had heard additional evidence.

Later, when the State gave notice of its intent to offer the video through its next witness, the trial court dismissed the jury, and the parties again engaged in a lengthy back-and-forth regarding the video's admissibility. Ultimately, the trial court overruled Caldwell's Rule 403 objection, and the video was played for the jury.

Katie Scott, a forensic toxicologist with the Tarrant County Medical Examiner's Office (TCME) who tested Caldwell's blood sample in May 2019, testified that Caldwell's blood–alcohol concentration was approximately 0.13 grams per deciliter, plus or minus 0.02 grams per deciliter, at the time it was drawn. When the sample was retested in July 2021, the result was 0.10 grams per deciliter, plus or minus 0.01 grams per deciliter. As Scott explained, this difference in the test results was not unexpected because the alcohol in the blood sample oxidizes over time.

Dr. Robert Johnson, the TCME's chief toxicologist, testified that given the time of Caldwell's last drink, the time of the stop, the time of the eventual blood

draw, and the toxicology results, he could extrapolate that Caldwell's blood–alcohol concentration was between 0.16 and 0.22 grams per decileter at the time the accident occurred. He also opined that it was not possible that Caldwell's blood–alcohol concentration was below 0.08 at the time of the accident.

Ultimately, the jury found Caldwell guilty of felony DWI and further found that he had used his vehicle as a deadly weapon during the commission of the offense. After a punishment hearing, the trial court sentenced Caldwell to thirty years in prison. This appeal followed.

## III. DISCUSSION

### A. Charge Error

In his first issue, Caldwell argues that the trial court erred by failing to include the statutory definition of "alcohol concentration" in the jury charge. Although the State concedes that the definition should have been included, it contends that we should nevertheless overrule Caldwell's first issue because the error did not cause him sufficient harm to warrant reversal. We agree with the State.

#### 1. Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.* However, if the charge is erroneous, then we must decide whether the appellant was harmed. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013);

7

*see Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). The standard of review to be applied in assessing harm depends on whether the defendant preserved the error. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). If a defendant timely objects to alleged jury-charge error, the record need only show "some harm" to obtain relief. *Id.* But in the absence of a timely objection, the record must show "egregious harm." *Id.*

## 2. The Trial Court Should Have Included the Statutory Definition of "Alcohol Concentration" in the Jury Charge

The trial court is required to give the jury a written charge that, among other things, "set[s] forth the law applicable to the case." Tex. Code Crim. Proc. Ann. art. 36.14. The "law applicable to the case" includes "statutory definitions that affect the meaning of the elements of the offense." *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011); *see Watson v. State*, 548 S.W.2d 676, 679 n.3 (Tex. Crim. App. 1977) ("The trial court should always include the statutory definitions in its jury instructions where applicable.").

To establish that Caldwell had committed the charged felony DWI offense, the State had to prove that (1) he was intoxicated (2) while operating a motor vehicle (3) in a public place (4) after having been previously convicted of DWI at least two times. *See* Tex. Penal Code Ann. §§ 49.04(a), 49.09(b)(2). The Penal Code defines "intoxicated" as "(A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . or (B) having an alcohol concentration of

0.08 or more." *Id.* § 49.01(2). It further defines "alcohol concentration" to mean "the number of grams of alcohol per 210 liters of breath, 100 milliliters of blood, or 67 milliliters of urine." *Id.* § 49.01(1).

Because one element of Caldwell's charged offense was that he was "intoxicated" and because "intoxicated" and "alcohol concentration" are statutorily defined terms with intertwining definitions, the trial court should have defined "alcohol concentration" in its charge. *See Ray v. State*, 749 S.W.2d 939, 943 (Tex. App.—San Antonio 1988, no pet.) (holding that because "'[a]lcohol concentration' has a particularized definition," it "should have been defined by the trial court" in the jury charge), *abrogated on other grounds by Atkinson v. State*, 923 S.W.2d 21, 23 (Tex. Crim. App. 1996); *see also Burnett v. State*, 541 S.W.3d 77, 84 (Tex. Crim. App. 2017) (acknowledging that "the trial court is obliged to include in the jury charge statutory definitions that affect the meaning of elements of the crime" (citing *Villarreal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009))). Thus, the trial court's failure to define "alcohol concentration" in the jury charge was error. *See Ray*, 749 S.W.2d at 943.

### 3. The Error Did Not Cause Caldwell Egregious Harm

Having concluded that the charge was erroneous, we must determine whether Caldwell was harmed. *Wooten*, 400 S.W.3d at 606. Because Caldwell did not object to the jury charge, he is not entitled to reversal unless he can show that the trial court's failure to define "alcohol concentration" caused him egregious harm. *See Almanza*, 686 S.W.2d at 171. "An egregious harm determination must be based on a finding of

9

actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, 686 S.W.2d at 172).

Caldwell argues that the error was egregiously harmful because it "affected the very basis of the case"—the dispute as to whether Caldwell was intoxicated—and "vitally affected a defensive theory." We disagree.

The forensic toxicology results entered into evidence measured the alcohol concentration of Caldwell's blood sample in grams of alcohol per deciliter[6] of blood, which is the correct ratio according to the term's statutory definition. *See* Tex. Penal Code Ann. § 49.01(1). Caldwell never questioned the alcohol-concentration ratio used by the toxicologist or suggested that the toxicology results were inaccurate or misleading because the toxicologist used the wrong ratio. Indeed, Caldwell's trial counsel explicitly stated during his closing argument that he did not "have any qualms" with the toxicologist's testimony concerning Caldwell's blood–alcohol

---

[6]One deciliter equals 100 milliliters. *Daniels v. State*, No. 01-95-00627-CR, 1995 WL 716990, at *6 n.7 (Tex. App.—Houston [1st Dist.] Dec. 7, 1995, no pet.) (not designated for publication); *see also Ward v. State*, No. 02-19-00246-CR, 2021 WL 386936, at *2 (Tex. App.—Fort Worth Feb. 4, 2021, no pet.) (mem. op., not designated for publication).

concentration. Thus, although the issue of whether Caldwell was intoxicated was certainly central to the case, the record does not show that the trial court's failure to define "alcohol concentration" in the jury charge affected Caldwell's defensive theory or had any bearing on the jury's finding on that issue. Accordingly, the record does not show that Caldwell suffered any actual harm, much less egregious harm. *See Ray*, 749 S.W.2d at 943 (concluding that the trial court's failure to define "alcohol concentration" in the jury charge was not reversible error under the less-stringent "some harm" charge-error standard because the definition would not have assisted the appellant in making his case to the jury and because the "alcohol breath test supervisor" had correctly defined "alcohol concentration" in his testimony); *see also Cosio*, 353 S.W.3d at 777 (clarifying that to be "egregious," harm must be actual, not merely theoretical).

We overrule Caldwell's first issue.

## B. Admission of Surveillance Video Over Caldwell's Rule 403 Objection

In his second issue, Caldwell argues that the trial court abused its discretion by admitting over Caldwell's Rule 403 objection the surveillance video showing Caldwell's car hitting a pedestrian. *See* Tex. R. Evid. 403. We disagree.

### 1. Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990). We will not reverse a

11

trial court's decision to admit or exclude evidence unless the record shows a clear abuse of discretion. *Zuliani*, 97 S.W.3d at 595. An abuse of discretion occurs only when the trial court's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.* If the trial court's evidentiary ruling is correct on any applicable theory of law, we will not disturb it even if the trial court gave the wrong reason for its correct ruling. *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd).

### 2. Rule 403

Even if evidence is relevant, it can still be excluded under Rule 403 if the danger of unfair prejudice substantially outweighs the evidence's probative value. *McNeil v. State*, 398 S.W.3d 747, 756 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also* Tex. R. Evid. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial." *James v. State*, 623 S.W.3d 533, 546–47 (Tex. App.—Fort Worth 2021, no pet.) (first citing *Montgomery*, 810 S.W.2d at 389; and then citing *Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *7 (Tex. App.—Fort Worth Jan. 24, 2019, no pet.) (mem. op., not designated for publication)). Because of this presumption, it is the burden of the party opposing the admission of the evidence to show that the evidence's probative value is substantially outweighed by one or more of the dangers listed in Rule 403— including unfair prejudice. *James*, 623 S.W.3d at 547; *Wells v. State*, 558 S.W.3d 661,

12

669 (Tex. App.—Fort Worth 2017, pet. ref'd); *Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd).

To determine whether evidence is admissible in the face of a Rule 403 objection, the trial court must conduct a balancing test. *Montgomery*, 810 S.W.2d at 389; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The Texas Court of Criminal Appeals has instructed that when undertaking a Rule 403 analysis, courts must balance (1) the inherent probative force of the proffered item of evidence and (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42. "In reviewing the trial court's balancing determination under Rule 403, we are to 'reverse the trial court's judgment rarely and only after a clear abuse of discretion.'" *Martinez v. State*, 468 S.W.3d 711, 718 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (quoting *Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.)).

### 3. Probative Value

The first two *Gigliobianco* factors assess "probative value," Rule 403's "first key phrase." *Gigliobianco*, 210 S.W.3d at 641. Probative value pairs "the inherent

probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation . . . with the proponent's need for that item of evidence." *Id.* When the State has "other compelling or undisputed evidence to establish" what the evidence in question "goes to prove," the value of the objected-to evidence is much less. *Id.* (quoting *Montgomery*, 810 S.W.2d at 390).

Here, the trial court reasonably could have concluded that the video's inherent probative force was considerable because it depicted Caldwell's actual driving behavior, which was directly relevant to the central question that the jury had to decide—whether Caldwell was driving while intoxicated. As the State argued at trial and argues now on appeal, Caldwell's failure to brake or swerve to avoid colliding with the pedestrian—as shown on the video—is probative as to his intoxication. *See Kuciemba v. State*, 310 S.W.3d 460, 463 (Tex. Crim. App. 2010) (noting that a driver's failure to brake provides some evidence that an accident was caused by intoxication); *Hendrickson v. State*, No. 02-12-00175-CR, 2014 WL 1858052, at *2 (Tex. App.—Fort Worth May 8, 2014, pet. ref'd) (mem. op., not designated for publication) (same); *Benson v. State*, No. 01-12-00325-CR, 2013 WL 655205, at *7 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (mem. op., not designated for publication) (noting that jury's finding of intoxication was supported by, among other things, "evidence that appellant was speeding and failed to apply his brakes before hitting [the victim's] motorcycle"). Further, because the video showed the manner in which Caldwell used

14

his motor vehicle and the vehicle's infliction of bodily injury on the pedestrian, it also had a direct bearing on the deadly-weapon allegation.[7] *See Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009).

In addition, while the State certainly had other evidence bearing on Caldwell's intoxication, it was not undisputed. For example, Caldwell attacked Officer Hancock's testimony, going so far as to call him a liar. Caldwell also stressed the fact that he had no indication of vertical-gaze nystagmus and directed the jury to consider other videos that he argued would show that his speech was not slurred, his eyes were

---

[7]Caldwell argues that the video had no probative value on the deadly-weapon allegation because (1) Officer Hancock had already testified—prior to the video's admission—that Caldwell's car could qualify as a deadly weapon and (2) a deadly-weapon finding can be considered a punishment-phase issue. However, while Officer Hancock's testimony may arguably have lessened the State's need for the video evidence, the video's inherent probative force regarding the deadly-weapon allegation cannot be questioned. It is a unique piece of evidence that conveyed what testimony could not: a visual representation of Caldwell's driving behavior and the vehicle's actual infliction of bodily injury. *See Martinez*, 468 S.W.3d at 718 (rejecting appellant's argument that videos showing victim's injuries should have been excluded under Rule 403 on the grounds that physicians had already testified regarding the victim's condition because the videos "were . . . unique pieces of evidence" and "conveyed what testimony could not: a visual representation of the seriousness of [the victim's] injuries"). Further, the mere fact that the deadly-weapon allegation could conceivably have been decided as part of the trial's punishment phase is irrelevant. In Caldwell's case, the jury made the deadly-weapon finding during the trial's guilt–innocence phase; this was not improper. *See Hill v. State*, 913 S.W.2d 581, 586 (Tex. Crim. App. 1996) ("We agree that the *better* practice is to submit the deadly weapons special issue charge at the guilt/innocence phase of the trial."); *McGruder v. State*, No. 10-22-00175-CR, 2023 WL 2309829, at *4–5 (Tex. App.—Waco Mar. 1, 2023, pet. ref'd) (mem. op., not designated for publication) ("[T]he Court of Criminal Appeals has 'never held that it is improper to submit the deadly weapons special issue at the guilt–innocence phase.'" (quoting *Hill*, 913 S.W.2d at 586)).

not twitching, and he was not swaying at the police station. Moreover, although Caldwell did not directly attack the toxicology results, he made much of the fact that they—along with the vials containing his blood sample and related paperwork— reflected the subject's name as "Marcus Simmons," not Marcus Caldwell.[8] Because the State's other evidence of intoxication was disputed, the trial court could reasonably have concluded that the State needed the video and that the other evidence did not significantly reduce the video's probative value. *Cf. Gigliobianco*, 210 S.W.3d at 641 ("[W]hen the proponent [of an item of evidence] has other *compelling or undisputed* evidence to establish the proposition or fact that the [item of evidence] goes to prove, the [probative value of the item of evidence] will weigh far less than it otherwise might in the probative-versus-prejudicial balance." (emphasis added) (quoting *Montgomery*, 810 S.W.2d at 390))).

Therefore, taken together, the first two factors weigh in favor of admission.

### 4. Countervailing Factors

Having determined that the extraneous offense evidence had probative value, we must now weigh that probative value against the danger that this evidence would unfairly prejudice Caldwell, confuse or mislead the jury, or cause undue delay. *See id.*

---

[8]As Caldwell explained during the punishment hearing, his legal name is Marcus Simmons, but he started using the last name Caldwell—his mother's maiden name— when he was approximately seventeen years old. Because the identification card that Caldwell provided to Officer Hancock at the time of his arrest showed his name as Marcus Simmons, this was the name reflected on the police paperwork relating to his case.

16

Unfair prejudice "refers to a tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* Evidence is not excludable under Rule 403 if it is merely prejudicial; "all evidence against a defendant is . . . designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013); *see* Tex. R. Evid. 403. Thus, Rule 403 is not concerned with merely prejudicial evidence but instead with evidence that is *unfairly* prejudicial. Tex. R. Evid. 403; *Pawlak*, 420 S.W.3d at 811. "'[C]onfusion of the issues,' refers to a tendency to confuse or distract the jury from the main issues in the case. Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues." *Gigliobianco*, 210 S.W.3d at 641. "[M]isleading the jury" involves the likelihood that a jury will place too much weight on the evidence for some reason not involving emotion. *Id.* "For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Id.*

Caldwell points to several countervailing factors that he contends "substantially" weigh against the video's admission. Specifically, he argues that (1) the video posed a danger of unfair prejudice because of its graphic nature; (2) it created a danger of confusing or distracting the jury because it showed no driving behavior that could be connected to his charged offense; and (3) it consumed an inordinate amount of time to present. We disagree with Caldwell's contention that these factors substantially outweigh the video's probative value. *See* Tex. R. Evid. 403.

17

First, while the video's graphic nature is not in dispute, that does not necessarily render it inadmissible under Rule 403. *See Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998) ("Although a crime scene photograph may be gruesome, that fact alone will rarely render the photograph *necessarily* inadmissible under Rule 403."); *Mouton v. State*, No. 10-21-00291-CR, 2023 WL 1823316, at *2 (Tex. App.—Waco Feb. 8, 2023, pet. ref'd) (mem. op., not designated for publication) ("[M]erely because a photograph or video is gruesome does not render it inadmissible." (citing *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999))). As noted above, the video showed Caldwell's actual driving behavior, including how Caldwell did not brake or swerve to avoid hitting the pedestrian even though he was more than halfway through the crosswalk. Although the video was graphic and damaging to Caldwell's case, we cannot say that it was unfairly prejudicial given that it provided the jury with evidence of exactly what happened. *See Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007) ("Unfair prejudice does not arise from the mere fact that evidence injures a party's case."); *cf. Hernandez v. State*, No. 11-09-00065-CR, 2010 WL 4148359, at *2 (Tex. App.—Eastland Oct. 21, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that the recording of appellant's police interview, which had been admitted during sentencing after appellant had pleaded guilty, was not unfairly prejudicial even though it portrayed the appellant as denying the offense and blaming others because it showed "exactly what happened during the interview").

Second, we disagree with Caldwell's contention that the video posed an "exceptional danger" of confusing or distracting the jury from the main issues in the case. According to Caldwell, the video had no probative value on the only contested element of the charged offense—intoxication—because Lovett, the collision reconstructionist, testified that the video showed no driving behavior that could be connected to Caldwell's charged offense. But Caldwell mischaracterizes Lovett's testimony. Lovett testified that he recommended that Caldwell be charged only with DWI, not intoxication assault, because "there was no way to effectively show a jury that . . . Caldwell was . . . speeding, running a red light, [or] doing anything . . . against the law" that could satisfy the causation element of intoxication assault. Thus, Lovett testified that the video could not conclusively prove that Caldwell had violated any traffic laws. However, the video's inconclusiveness regarding whether Caldwell was speeding or running a red light at the time of the collision would not prevent the jury from concluding that his failure to brake or swerve to avoid hitting the pedestrian was indicative of intoxication. Indeed, far from confusing or distracting the jury from the main issue, the video, as direct evidence of Caldwell's driving behavior, helped the jury to focus on the main issue—whether Caldwell's mental and physical faculties were impaired by intoxication.

Finally, Caldwell's contention that the video consumed an inordinate amount of time to present is meritless. The State redacted the original video down to twenty seconds so that the only portion shown to the jury focused on Caldwell's failure to

19

brake or swerve. While a significant amount of time was spent addressing Caldwell's Rule 403 objection, it does not appear from the record that the actual presentation of the twenty-second video consumed an inordinate amount of time from the multiple-day trial.[9] *Cf. Hubbard v. State*, No. 02-23-00067-CR, 2023 WL 7399135, at *4 n.8 (Tex. App.—Fort Worth Nov. 9, 2023, no pet. h.) (mem. op., not designated for publication) (concluding that the time spent to present evidence was "far from 'inordinate'" where it consumed "no more than forty to forty-five minutes of a trial in which the guilt–innocence phase spanned three calendar days and included eight total witnesses"); *Ibenyenwa v. State*, 367 S.W.3d 420, 426 (Tex. App.—Fort Worth 2012, pet. ref'd) (holding that the trial court had not abused its discretion by overruling appellant's Rule 403 objection to the admission of a recorded interview of the child complainant in his trial for sex-related offenses in part because the recording "was

---

[9]Caldwell claims that both parties' closing arguments "were consumed" with addressing the video, but the record belies this assertion. While the State did reference the video during closing, it was only one small piece of the State's argument. Even when addressing the intoxication element, the State spent the vast majority of its time focusing on other evidence, including Officer Hancock's testimony and body-camera footage, the footage of Caldwell falling asleep in the patrol car while being transported to jail, and the toxicology results. Likewise, Caldwell referenced the video during closing and actually encouraged the jury to watch the unedited version— together with all of the other videos that had been admitted into evidence—during its deliberations, but he did not focus on the video, and his references thereto made up only one small part of his overall closing argument. Thus, the video did not consume an inordinate amount of time from the parties' closing arguments, much less the entire trial.

20

only about forty minutes long" and thus "there was little danger of it[s] taking an undue amount of time from the remainder of the trial").

### 5. Resolution

Considering all of the relevant *Gigliobianco* factors and bearing in mind that we are to reverse a trial court's balancing determination under Rule 403 only in rare cases, *see Martinez*, 468 S.W.3d at 718, we cannot conclude that the trial court abused its discretion by admitting the video, *see Zuliani*, 97 S.W.3d at 595. Accordingly, we overrule Caldwell's second issue.[10]

## IV. CONCLUSION

Having overruled both of Caldwell's issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 7, 2023

---

[10]In his brief, Caldwell asserts that he was harmed by the trial court's supposedly erroneous admission of the video. However, because we have concluded that the trial court did not err by admitting the video, we do not need to conduct a harm analysis. *See* Tex. R. App. P. 47.1; *Montoya v. State*, No. 13-12-00736-CR, 2014 WL 223228, at *2 n.7 (Tex. App.—Corpus Christi–Edinburg Jan. 16, 2014, pet. ref'd) (mem. op., not designated for publication).